## WESTERN UNION TELEGRAPH COMPANY
### *v.* STATE OF GEORGIA.

676

No. 17319. FEBRUARY 14, 1951. REHEARING DENIED MARCH 14, 1951.

*John H. Waters, William G. H. Acheson, Heyman, Howell & Heyman,* and *Morris B. Abram,* for plaintiff in error.

*Eugene Cook, Attorney-General, M. H. Blackshear, Assistant Attorney-General,* and *Bland Goodwin,* contra.

*John P. Randolph, Walter R. McDonald,* and *Austin L. Roberts,* for persons at interest, not parties.

ALMAND, Justice. The exception here is to a judgment assessing a penalty of $2500, in a suit by the State of Georgia under the provisions of Code § 93-416 against Western Union Telegraph Company, on account of its alleged failure to obey Rule No. 2 of the Georgia Public Service Commission, which rule, in substance, prohibits a telegraph company doing business in this State from closing, removing, suspending, discontinuing, or abolishing an office or agency once established by the company in Georgia, without authority granted by the Public Ser-

vice Commission. On the trial of the case before the judge without the intervention of a jury, the following undisputed facts appeared:

Until March 20, 1948, Western Union Telegraph Company operated a Class 1-B office in Blakely, Georgia. Western Union is engaged in the business of a common carrier in the transmission of messages for hire; it has wires, poles, and facilities for the transmission and receiving of telegraphic communications by wire in substantially all the large cities and towns in the United States, and such system is used in the transmission of messages, both interstate and intrastate, and the same employees handle both classes of messages. The services and facilities pertaining to both kinds of messages at its Blakely office are so intertwined that no separation of the facilities or of employees on the basis of interstate and intrastate business is possible or practicable, and approximately 85% of the gross revenues received for services rendered are in connection with interstate transmission of messages, and 15% results from intrastate business. Under the provisions of section 214 of the Federal Communications Act of 1934, as amended in 1943 (47 U. S. C. A., § 151 et seq.), Western Union made application to the Federal Communications Commission to discontinue its Class 1-B office at Blakely, and operate a teleprinter-operated agency office at said place. One of the reasons for the change was that the volume of business at Blakely was insufficient to keep one employee occupied, and such change would effect a saving of $122 per month, and the agency office to be established would observe longer hours of service, and provide comparable pickup and delivery service by the teleprinter-operated agency office. Notice of this application was given to the State of Georgia and the Georgia Public Service Commission. Thereafter, on February 26, 1948, the Federal Communications Commission granted authority to Western Union to discontinue its Class 1-B office, and permission was given to substitute a teleprinter-operated agency office. In response to the rule issued by the Georgia Public Service Commission, to show cause why it did not obtain authority from that commission before changing the type of service at Blakely, Western Union contended, as it did on the trial of the penalty suit, that under the Federal Com-

munications Act as amended it was relieved from any obligation to comply with Rule No. 2 of the Georgia Public Service Commission, and that only the Federal Communications Commission had authority to grant it permission to change the type of service at Blakely. The contention of Western Union was that Congress, under the Communications Act of 1934, as amended by the act of 1943, had pre-empted the field of the regulation of the defendant's business in so far as the same concerned the discontinuance, reduction, impairment, or abandonment of services or facilities at Blakely, as a telegraph company engaged in interstate commerce, and that said rule was illegal, null and void as violating the commerce clause of the Federal Constitution, art. 1, sec. 8, par. 3. Other constitutional attacks were made on Code § 93-416 which, in the view we take of the case, need not be recited here.

The controlling question is: Did Congress, by the enactment of the Communications Act of 1934 (Ch. 652, sec. 1, 48 St. L. 1064), as amended by the act of 1943 (Ch. 10, sec. 2, 57 St. L. 11), pre-empt the field as to the operation by Western Union of a local agency or office handling both interstate and intrastate messages, as shown by the facts in this case, so as to relieve the telegraph carrier from compliance with Rule No. 2 of the Georgia Public Service Commission in a change of the character of service at its office and agency at Blakely, Georgia? If the answer to this question is in the affirmative, the rule has no application, and the suit by the State for the penalty has no basis.

■■ Headnotes 1 and 2 require no elaboration.

■ The Interstate Commerce Act of 1887 (Ch. 104, sec. 1, 24 St. L. 379), was amended on June 18, 1910 (Ch. 309, sec. 7, 36 St. L. 545), by classifying telegraph companies as public-service agencies under Federal control, and placed such utilities under the administration and control of the Interstate Commerce Commission. On June 19, 1934, Congress created the Federal Communications Commission, and transferred to such commission all the regulative and administrative powers formerly exercised over telegraph companies by the Interstate Commerce Commission. Ch. 652, 48 St. .L. 1064. In creating this Commission, Congress in section 1 of this act declares the legislative purpose

of the act to be: "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio commnuication, there is hereby created a commission to be known as the 'Federal Communications Commission,' which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this Act." 47 U. S. C. A., § 151.

Section 2 (b) of this act provides: "Subject to the provisions of section 301, nothing in this Act shall be construed to apply to or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communications service of any carrier." 47 U. S. C. A., § 152 (b). Section 301, referred to in this paragraph, has reference to radio communications alone. Section 3 (a) of the act defines "wire communication" or "communication by wire" as "the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C.A., § 153 (a). Section 214 (a) of the act provides that no carrier can undertake the construction of a new line or the extension of any line, or engage in the transmission over or by means of such additional line without first obtaining from the commission a certificate of public convenience and necessity; provided, however, that no such certificate is required for the construction, acquisition, operation, or extension of (1) a line within a single State unless such line constitutes a part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any lines acquired under section 221 of the act. 47 U.S.C.A., § 214 (a). This latter section (221), is a special section that relates only to telephone

companies. Under the provisions of subsection (b), notice of any such application was required to be given to the Governor of each State in which said line is proposed to be constructed, extended, acquired, or operated.

On March 6, 1943, by Ch. 10, § 2, 57 St. L. 11, section 214 (a) of the act of 1934 was amended by adding thereto the following: "No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term 'line' means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels." Section 3 of this act of 1943 amended section 214 (b) by providing that, upon receipt of an application for the certificate required under section 214 (a), the commission should be required to give notice to the Secretary of War, Secretary of the Navy, and the Governor of each State in which such discontinuance, reduction, or impairment of service is proposed, with the right of those notified to be heard. 47 U.S.C.A., § 214 (b).

The standard required of the commission in the application of section 214 (a) is that its action shall be "in the interest of public convenience and necessity;" and that neither the present nor the future public convenience will be affected thereby, so as to secure the broad aims of the Communications Act. Interstate Commerce Commission v. Parker Motor Carrier, 326 U. S. 60 (65 Sup. Ct. 1490, 89 L. ed. 2051).

On the facts appearing in the record, it is evident that Western Union Telegraph Company's office at Blakely, as to facilities and service, operates as a single unit in the transmission and reception of both interstate and intrastate communications, of which 85% are interstate messages. Counsel for the State contend that section 2 (b) of the Communications Act of 1934

(47 U.S.C.A., § 152 (b)), expressly excludes the Federal Communications Commission jurisdiction as to "service, facilities or regulations for or in connection with intrastate communication service" of telegraph companies. They admit that Congress had the power to empower the Federal Communications Commission to do what was done in this case, but contend that it has not exercised such power. It is conceded that, where the facilities or services are engaged entirely in interstate commerce, the Federal Communications Commission has sole jurisdiction as to change in services or facilities under section 214 (a), but it is contended that, where such services embrace both interstate and intrastate service, it was the intent of Congress under section 2 (b) of the act of 1934 (47 U.S.C.A., § 152 (b)) that the State's power over the intrastate services should not be superseded; but that the power of regulation should remain in the respective State public-service commissions. Bearing in mind the conceded facts in this case—that the services and facilities at the Blakely office pertaining to interstate and intrastate communications were so interlocked that there could be no possible or practicable separation of either facilities or employees on the basis of interstate and intrastate messages—the consequence of the State's position would mean that, for the telegraph company to comply with both Federal and State regulations, it would have to maintain two separate offices, one for the reception of interstate messages and another for intrastate service, which, carried to its logical conclusion, would require the utility, as to every office in this State and the other 47 States of the Union, where its facilities are for both interstate and intrastate business, to maintain separate facilities. How dual control of the Blakely office would work is illustrated by the following supposititious case: The telegraph company applies to both commissions for authority to change the type of its agency at Blakely on the basis of reducing the costs of its service. The State commission approves the application, but the Federal commission disapproves. Since the office and facilities as one unit serve both interstate and intrastate commerce, it would be impossible to comply with the order of the State commission without disobeying the Federal commission by the maintenance of one office. To comply with both orders, the company

would have to maintain two offices, and the disobedience of either order would incur the risk of suffering heavy penalties. Such conflict of dual control would thwart one of the main purposes of the Communications Act, viz.; "to make available as far as possible to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire . . communication service with adequate facilities at reasonable charges."

In view of the clear purpose of the Communications Act to maintain a unified nation-wide system of wire communications and a unitary control over interstate commerce, we are of the opinion, from a consideration of the entire act as amended, that the intent of Congress was that the Federal Communications Commission should have jurisdiction as to a reduction or change of service of any facility, agency, or office of a telegraph company, where such facility, agency, or office constitutes an inseparable unit engaged in both interstate and intrastate wire communications, and that the State commission would have no jurisdiction as to abandonment, reduction, and impairment of service of such agency or office. It was really unnecessary to place the restriction as contained in section 2 (b) of this act (47 U.S.C.A., § 152 (b)), on the Federal commission, because under the Federal Constitution the right to control intrastate commerce is not in Congress. Other sections of the act demonstrate that this was the intent of Congress. Section 214 (a) forbids a telegraph company, without first obtaining consent of the Federal commission, from constructing a new line or extending an old line where the line is in a single State and constitutes a part of an interstate line, or where the extension of a local or branch or terminal line exceeds ten miles in length. Certainly, if Western Union cannot extend a line constituting a part of an interstate line to another part of the same State, which would also serve intrastate business, without the permission of the Federal Communications Commission, we cannot see how at the same time it could be said that it was not the intent of Congress to vest in the Federal Communications Commission power to control the reduction or impairment of the facilities and services of both classes of communications, particularly where the classes of service are incapable of separation. In section 214 (c) of the act (47 U.S.C.A., § 214 (c)), it

is provided that, after the Federal Communications Commission issues a certificate that the public convenience and necessity will not be adversely affected by the change in service, "the carrier may, without securing approval other than such certificate, comply with the terms" of the commission's order. This shows a clear intent on the part of Congress that, where the services of the carrier involve both interstate and intrastate communications, consent to reduce the same need not be obtained from any other regulatory body. Section 221 (b) (47 U.S.C.A., § 221 (b)) also appears to be significant. This section deals alone with telephone companies, and provides: "Nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire telephone exchange service, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State Commission or by local governmental authority." There is no similar provision relating to telegraph companies. Certainly, if Congress had desired to leave to the State regulatory commissions the power to regulate the services of an agency or office of telegraph companies doing both classes of business, it would have said so.

We are of the opinion that on principle the ruling in Colorado v. U. S., 271 U. S. 153 (46 Sup. Ct. 452, 70 L. ed. 878), controls the case at bar. There the State of Colorado sought to set aside an order of the Interstate Commerce Commission, which had granted a certificate to a railroad company to abandon its line, which was a branch line located wholly within the State of Colorado; it being contended by the State that there had not been conferred upon the commission the power to permit a carrier to abandon intrastate service against the wishes of the State, and that, though the commission had the right to permit the carrier to abandon interstate service on the branch line, it had no authority to authorize abandonment of the carrier's intrastate service. The court held that Congress had power to authorize abandonment of such local branch, because the State's power to regulate and promote intrastate commerce could not be asserted in such a way as to prejudice interstate

commerce. In its opinion, the court said: "The sole objective of paragraphs 18-20 is the regulation of interstate commerce. Control is exerted over intrastate commerce only because such control is a necessary incident of freeing interstate commerce from the unreasonable burdens, obstruction or unjust discrimination which are found to result from operating a branch at a large loss. Congress has power to authorize abandonment, because the State's power to regulate and promote intrastate commerce may not be exercised in such a way as to prejudice interstate commerce." (P. 163.) "This railroad, like most others, was chartered to engage in both intrastate and interstate commerce. The same instrumentality serves both. The two services are inextricably intertwined. The extent and manner in which one is performed, necessarily affects the performance of the other. Efficient performance of either is dependent upon the efficient performance of the transportation system as a whole." (P. 164.)

■ Congress having pre-empted the field of regulation of the interstate business of Western Union Telegraph Company, and by statute having authorized the Federal Communications Commission to grant to said company authority to reduce the services of an agency or office handling both interstate and intrastate communications by wire, and these services and facilities being so interwoven and interdependent at the Blakely, Georgia, office that they cannot be separated, such act of Congress superseded the power of the State of Georgia in this regard, and Rule No. 2 of the Georgia Public Service Commission is inoperative in so far as the State may contend that Western Union is required to obtain the consent of the State commission before it changes the character and nature of the services rendered by its office at Blakely. To enforce said rule, under the facts and law of this case, would be in direct conflict with the exerted power of the Congress of the United States under the commerce clause of the Federal Constitution. Therefore, the failure of Western Union to comply with Rule No. 2 of the Georgia Public Service Commission—the same being inapplicable to it—did not constitute a lawful basis for a recovery of a penalty by the State under Code § 93-416, and it was error to award the State a penalty judgment in this case.

*Judgment reversed. All the Justices concur.*