HEAD, doing business as LEA COUNTY PUBLISH-
ING CO., et al. v. NEW MEXICO BOARD OF
EXAMINERS IN OPTOMETRY.

No. 392.   Argued April 15–16, 1963.—Decided June 17, 1963.

*Carol J. Head* argued the cause and filed briefs for
appellants.

*Earl E. Hartley,* Attorney General of New Mexico, and
*Robert F. Pyatt,* Special Assistant Attorney General,
argued the cause and filed a brief for appellee.

By special leave of Court, *Solicitor General Cox* argued the cause for the United States, as *amicus curiae,* urging reversal as to appellant Permian Basin Radio Corp. With him on the brief were *Assistant Attorney General Loevinger, Bruce J. Terris, Lionel Kestenbaum, Max D. Paglin, Daniel R. Ohlbaum* and *Ruth V. Reel.*

*Ellis Lyons, Leonard J. Emmerglick, Harold Kohn* and *William P. MacCracken, Jr.* filed a brief for the American Optometric Association, Inc., as *amicus curiae,* urging affirmance.

Opinion of the Court by MR. JUSTICE STEWART, announced by MR. JUSTICE WHITE.

This case comes to us on appeal from the Supreme Court of New Mexico. One of the appellants, Agnes K. Head, owns a newspaper in Hobbs, New Mexico. The other appellant, Permian Basin Radio Corporation, owns and operates a radio station there. Hobbs is in the southeastern corner of the State, close to the Texas border, and much of the area served by both the radio station and the newspaper lies in Texas. The appellants were enjoined from accepting or publishing within the State of New Mexico a Texas optometrist's advertising found to be in violation of New Mexico law. The appellants claim that the state law, as applied, imposes an unlawful burden on interstate commerce. Permian also argues that regulation of advertising by radio has been preempted by the Communications Act of 1934.[1] We noted probable jurisdiction, 371 U. S. 900, and invited the Solicitor General to express the Government's views concerning the question of federal preemption. We have concluded that the judgment should be affirmed.

Section 67–7–13 of the New Mexico Statutes Annotated deals generally with the practice of optometry. It pro-

---

[1] 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.*

hibits several varieties of unauthorized practice, and forbids even licensed practitioners from employing certain sales techniques, such as house-to-house canvassing, peddling on streets or highways, or offering lenses and frames as premiums.[2] It also prohibits:

> "(m) Advertising by any means whatsoever the quotation of any prices or terms on eyeglasses, spectacles, lenses, frames or mountings, or which quotes discount to be offered on eyeglasses, spectacles, lenses, frames or mountings or which quotes 'moderate prices,' 'low prices,' 'lowest prices,' 'guaranteed glasses,' 'satisfaction guaranteed,' or words of similar import."

The purpose of this provision, according to the Supreme Court of New Mexico, is to "protect . . . citizens against the evils of price-advertising methods tending to satisfy the needs of their pocketbooks rather than the remedial requirements of their eyes." 70 N. M. 90, 94, 370 P. 2d 811, 813. Similar laws have been enacted in many States to assure high standards of professional competence.[3]

---

[2] "(i) Either in person or by or through solicitors or agents giving or offering to give to any person eyeglasses, spectacles or lenses, either with or without frames or mountings, as a premium or inducement for any subscription to any book, set of books, magazines, magazine, periodical or other publication, or as a premium or inducement for the purchase of any goods, wares or merchandise.

"(k) The making of a house to house canvass either in person or through solicitors or associates for the purpose of selling, advertising or soliciting the sale of eyeglasses, spectacles, lenses, frames, mountings, eye examinations or optometrical services.

"(l) The peddling of eyeglasses, spectacles or lenses from house to house or on the streets or highways, notwithstanding any law for the licensing of peddlers."

[3] See Ark. Stat. Ann. § 72–815 (1957 Replacement); Cal. Bus. & Professions Code § 3129; Del. Code Ann., Tit. 24, § 2113; Fla. Stat. Ann. §§ 463.11, 463.14; Hawaii Rev. Laws § 68–9 (d) (1960 Supp.);

The facts stated in the complaint were not disputed. Appellants received and published advertisements from Abner Roberts, an optometrist who resided and conducted his business in the State of Texas, just a few miles east of Hobbs. In the words of the complaint, this advertising consisted of "the quotation of prices on eyeglasses and spectacles, and of the quotation of discounts to be offered on eyeglasses and spectacles." The appellants conceded that the advertising violated § 67–7–13 (m). Finding the statute applicable and violated, the trial court enjoined each of the appellants "from accepting or publishing within the State of New Mexico advertising of any nature from Abner Roberts which quotes prices or terms on eyeglasses . . . or which quotes moderate prices, low prices, lowest prices, guaranteed glasses, satisfaction guaranteed, or words of similar import . . . ." The Supreme Court of New Mexico affirmed, ruling that the injunction did not unlawfully burden interstate commerce and that the State's jurisdiction had not been ousted by federal legislation. 70 N. M. 90, 370 P. 2d 811.

## I.

Without doubt, the appellants' radio station and newspaper are engaged in interstate commerce, and the injunction in this case has unquestionably imposed some

Ind. Stat. Ann. §§ 63–1018a (e), 63–1019 (f) (1961); Ky. Rev. Stat. § 320.300; La. Rev. Stat. § 37:1063; Mich. Stat. Ann. § 14.648 (i) (1961 Supp.); Minn. Stat. Ann. § 148.57 (3); Mo. Ann. Stat. § 336.110; Mont. Rev. Codes § 66–1302 (11); Neb. Rev. Stat. § 71–148; Nev. Rev. Stat. § 636:300 (10); N. J. Stat. Ann. § 45:12–11 (h) (1962 Supp.); N. C. Gen. Stat. § 90–124 (9); N. Dak. Cent. Code § 43–13–29; Okla. Stat. Ann., Tit. 59, § 943; Ore. Rev. Stat. § 683.140 (6); Pa. Stat. Ann., Tit. 63, § 237; R. I. Gen. Laws § 5–35–22; S. C. Code of Laws § 56–1075; S. Dak. Code § 27.0707 (6) (1960 Supp.); Tenn. Code Ann. § 63–815; Va. Code § 54–388, par. 2 (d).; Wash. Rev. Code Ann. § 18.53.140; W. Va. Code § 2937 (1961); Wis. Stat. Ann. § 153.10.

restraint upon that commerce. But these facts alone do not add up to an unconstitutional burden on interstate commerce. As we said in *Huron Portland Cement Co.* v. *City of Detroit,* 362 U. S. 440, upholding the application of a Detroit smoke abatement ordinance to ships engaged in interstate and international commerce: "In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' *Sherlock* v. *Alling,* 93 U. S. 99, 103; *Austin* v. *Tennessee,* 179 U. S. 343; *Louisville & Nashville R. Co.* v. *Kentucky,* 183 U. S. 503; *The Minnesota Rate Cases,* 230 U. S. 352; *Boston & Maine R. Co.* v. *Armburg,* 285 U. S. 234; *Collins* v. *American Buslines, Inc.,* 350 U. S. 528." 362 U. S., at 443–444.

Like the smoke abatement ordinance in the *Huron* case, the statute here involved is a measure directly addressed to protection of the public health, and the statute thus falls within the most traditional concept of what is compendiously known as the police power.[4] The legitimacy of state legislation in this precise area has been expressly established. *Williamson* v. *Lee Optical Co.,* 348 U. S.

---

[4] The case is not one, therefore, in which the State seeks to justify a statute as a health measure on the attenuated theory that the economic well-being of a profession or industry will assure better performance in the public interest. See *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 522–523. Compare *Semler* v. *Dental Examiners,* 294 U. S. 608.

483. A state law may not be struck down on the mere showing that its administration affects interstate commerce in some way. "State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand." *Huron Portland Cement Co.* v. *City of Detroit, supra,* at 448.

It has not been suggested that the statute, applicable alike to "any person" within the State of New Mexico, discriminates against interstate commerce as such. Nor can we find that the legislation impinges upon an area of interstate commerce which by its nature requires uniformity of regulation. The appellants have pointed to no regulations of other States imposing conflicting duties, nor can we readily imagine any. *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines,* 372 U. S. 714. We hold that the New Mexico statute, as applied here to prevent the publication in New Mexico of the proscribed price advertising, does not impose a constitutionally prohibited burden upon interstate commerce.[5]

## II.

In dealing with the contention that New Mexico's jurisdiction to regulate radio advertising has been preempted by the Federal Communications Act, we may begin by noting that the validity of this claim cannot be judged by reference to broad statements about the "comprehensive" nature of federal regulation under the Federal Com-

---

[5] The appellants have argued that the decree below will have the effect of preventing communication between the Texas optometrist and Texas residents. A similar argument was rejected in *Railway Express Agency* v. *New York,* 336 U. S. 106, which held valid a local ordinance prohibiting the display of advertising on trucks which also operated in other States.

munications Act.[6] "[T]he 'question whether Congress and its commissions acting under it have so far exercised the exclusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case.' Statements concerning the 'exclusive jurisdiction' of Congress beg the only controversial question: whether Congress intended to make its jurisdiction exclusive." *California* v. *Zook,* 336 U. S. 725, 731. *Kelly* v. *Washington,* 302 U. S. 1, 10–13. In areas of the law not inherently requiring national uniformity,[7] our decisions are clear in requiring that state statutes, otherwise valid, must be upheld unless there is found "such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field." *Florida Avocado Growers* v. *Paul,* 373 U. S. 132, 141.

The specific provisions of the federal statute chiefly relied upon to support Permian's claim are those governing the granting, renewal, and revocation of broadcasting licenses.[8] Under the broad standard of "public interest, convenience, and necessity," the Federal Communications Commission may consider a wide variety of factors in passing upon the fitness of an applicant. It is argued that the content of advertising is one of the factors which may be considered, and there is evidence that the Commission

---

[6] *E. g., National Broadcasting Co.* v. *United States,* 319 U. S. 190, 213 ("wide licensing and regulatory powers"), *id.,* at 217 ("comprehensive powers to promote and realize the vast potentialities of radio"); *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 137 ("unified and comprehensive regulatory system for the industry").

It is to be noted that this case in no way involves the Commission's jurisdiction over technical matters such as a frequency allocation, over which federal control is clearly exclusive. 47 U. S. C. § 301.

[7] See *Hines* v. *Davidowitz,* 312 U. S. 52.

[8] See 47 U. S. C. §§ 303 (j), 307 (a), (d), 308 (a), 309 (a), and 312.

itself has on occasion so interpreted its authority.[9]  Further, the United States argues that the Commission has the authority to promulgate general regulations concerning the subject of advertising for the guidance of broadcasters.  See *Federal Communications Comm'n* v. *American Broadcasting Co.,* 347 U. S. 284, 289–290.  This grant of federal power, it is argued, is sufficient to oust state regulation of radio advertising.

Assuming this to be a correct statement of the Commission's authority, we are nevertheless not persuaded that the federal legislation in this field has excluded the application of a state law of the kind here involved.  The nature of the regulatory power given to the federal agency convinces us that Congress could not have intended its grant of authority to supplant all the detailed state regulation of professional advertising practices, particularly when the grant of power to the Commission was accompanied by no substantive standard other than the "public interest, convenience, and necessity." [10] The Solicitor General has conceded that the power of license revocation is not a plausible substitute for state law dealing with "traditional" torts or crimes committed through the use of radio.  We can find no material difference with respect to the less "traditional" statutory violation here involved.  In the absence of

---

[9] We have been cited to specific instances in which the content of advertising analogous to that involved in this case has been considered.  See, *e. g., Farmers & Bankers Life Ins. Co.,* 2 F. C. C. 455; *WSBC, Inc.,* 2 F. C. C. 293; *Oak Leaves Broadcasting Station, Inc.,* 2 F. C. C. 298.  And see *KFKB Broadcasting Assn.* v. *Federal Radio Comm'n,* 60 App. D. C. 79, 47 F. 2d 670.

[10] See *Interstate Commerce Comm'n* v. *Los Angeles,* 280 U. S. 52, 68–70.  Compare *Allen B. Dumont Laboratories* v. *Carroll,* 184 F. 2d 153, which held state censorship of motion pictures shown on television preempted by those provisions of the federal act expressly dealing with "communications containing profane or obscene words, language, or meaning."  47 U. S. C. § 303 (m) (1) (D).

positive evidence of legislative intent to the contrary, we cannot believe Congress has ousted the States from an area of such fundamentally local concern.

Finally, there has been no showing of any conflict between this state law and the federal regulatory system, or that the state law stands as an obstacle to the full effectiveness of the federal statute. No specific federal regulations even remotely in conflict with the New Mexico law have been called to our attention. The Commission itself has apparently viewed state regulation of advertising as complementing its regulatory function, rather than in any way conflicting with it.[11] As in *Colorado Anti-Discrimination Comm'n* v. *Continental Air Lines, Inc.,* 372 U. S. 714, at 724, we are satisfied that the state statute "at least so long as any power the [Commission] may have remains 'dormant and unexercised,' will not frustrate any part of the purpose of the federal legislation."[12]

*Affirmed.*

MR. JUSTICE DOUGLAS concurs in the result.

---

[11] Our attention has been directed to the following statement of Commission policy:

"In those localities and states where the sale of alcoholic beverages is prohibited by local or state statutes, such advertising by radio in those areas would, of course, not be in the public interest, since adherence to the laws of the state in which a station is located, especially laws expressive of the public policy of the state or locality on subjects relative to health, safety, and morals, is an important aspect of operation in the public interest. Obviously, the same is true with respect to those areas where advertising of alcoholic beverages is prohibited by law." F. C. C. Letter to Sen. Edwin C. Johnson, Chairman of the Senate Committee on Interstate and Foreign Commerce, August 11, 1949, 5 Pike & Fischer Radio Reg. 593–594.

[12] The appellants urge three additional grounds for reversal. Each may be disposed of briefly. First, both appellants urge that the state statute deprives them of property, in violation of the Due Process Clause. That claim is foreclosed by *Williamson* v. *Lee Optical Co.,* 348 U. S. 483. See also *Ferguson* v. *Skrupa,* 372 U. S. 726. The

Mr. Justice Brennan, concurring.

I agree that the attack on the New Mexico statute as an unreasonable burden on interstate commerce has no merit and therefore join Part I of the Court's opinion. The attack based on the Supremacy Clause—the contention that the Federal Communications Act preempts the subject matter of this state regulation—is not, however, so easily answered. Although I conclude that it too cannot prevail, I think it is appropriate that I state separately my reasons for reaching that result. For only recently we held, in *Farmers Educational & Cooperative Union* v. *WDAY, Inc.*, 360 U. S. 525, that the Communications Act displaced the state law of defamation insofar as that law directly conflicted with the "equal time" aims of § 315. Cf. *Radio Station WOW, Inc.*, v. *Johnson*, 326 U. S. 120; *Allen B. Dumont Labs.* v. *Carroll*, 184 F. 2d 153. What reasons arise from the relevant state and federal legislation governing advertising which require a different conclusion in this case?

I.

I agree that, as the Court says, the New Mexico statute is not displaced by the FCC's powers "governing the granting, renewal, and revocation of broadcasting

appellant Head claims that denial of her right to do business with Abner Roberts is a violation of her privileges and immunities of national citizenship. But the Privileges and Immunities Clause of the Fourteenth Amendment does not create a naked right to conduct a business free of otherwise valid state regulation. *Madden* v. *Kentucky*, 309 U. S. 83, 92–93. Finally, it is contended that the injunction constitutes an invalid restraint upon freedom of speech protected by the Fourteenth Amendment. This argument was not made to the state courts, nor was it reserved in the notice of appeal to this Court. Under Rule 10, par. 2, of the Rules of this Court, "Only the questions set forth in the notice of appeal or fairly comprised therein will be considered by the court." See also Rule 15, par. 1 (c) (1).

licenses." If that were the only sanction which the Commission might apply to the advertising practices which the New Mexico statute forbids, the basis for any claim of the federal statute's preemptive effect would be removed. For the Commission has long disclaimed the effectiveness of attempting to police minor deviations and indiscretions in programming and advertising by the use of "the cumbersome weapons of criminal penalties and license refusal and revocation." *Regents of the University System of Georgia* v. *Carroll*, 338 U. S. 586, 602.[1] This obstacle led the Congress in 1960, on the recommendations

---

[1] See H. R. Rep. No. 1800, 86th Cong., 2d Sess. 16 ("The principal administrative sanctions which the FCC is presently authorized to invoke against licensees who flout the law are license revocation and cease and desist orders. Revocation, of course, amounts to a death sentence for the licensee. It may also have a serious effect upon the community served by the licensee. Because of its severity, it has seldom if ever been invoked."). See also, *e. g.*, Smead, Freedom of Speech by Radio and Television (1959), 3; Note, State Regulation of Radio and Television, 73 Harv. L. Rev. 386, 390 (1959); Note, Broadcast Licensee's Past Conduct as a Determinant of the Public Interest, 23 U. of Pitt. L. Rev. 157, 160 (1961). The comment of one author is particularly apposite to the question of this case: "The great reluctance of the Commission to exercise its power of revocation, its lack of power to suspend licenses and its recognition of the importance of commercial advertising to radio broadcasting, make it customary for broadcast advertising to be considered by the Commission only on applications for renewal of station licenses." 2 Socolow, The Law of Radio Broadcasting (1939), 1005.

Not only was the drastic nature of the "death sentence" a deterrent to its application against lesser violations—in addition, it was suggested that licensing controls constituted at best only indirect regulation of the parties primarily at fault in cases of advertising excesses or abuses—the networks and the sponsors themselves—and were therefore inequitable as well as unduly harsh. See Deceptive Practices in the Broadcasting Media, December 30, 1959, 19 Pike & Fischer Radio Reg. 1901, 1918; Note, The Regulation of Advertising, 56 Col. L. Rev. 1018, 1049 (1956).

of the Commission and the Attorney General,[2] to amend the Communications Act to authorize the Commission to impose money forfeitures, 47 U. S. C. § 503 (b), and to grant short-term licenses, 47 U. S. C. § 307 (d). The amendments also strengthened the Commission's preexisting power to issue cease-and-desist orders, 47 U. S. C. § 312 (b). The Commission was thus expressly given more discriminating tools "in dealing with violations in situations where revocation or suspension does not appear to be appropriate." [3]

The Commission has been prompt to apply its new sanctions. Some stations "whose violation records indicated need for closer supervision" have been limited to

[2] The Attorney General, in his letter to the President, summarized his recommendation as follows:

"Second, as a practical matter, the one sanction expressly conferred by statute upon the Federal Communications Commission for use against a broadcast licensee who fails to operate in the public interest is to withdraw his broadcasting license permanently—a sanction so severe that it has been imposed only rarely. The Federal Communications Commission should be expressly authorized also to impose less severe sanctions for actions violating the Communications Act or regulations issued pursuant to it. Such sanctions, for example, could include temporary suspension or conditional licenses." Deceptive Practices in the Broadcasting Media, Report to the President by the Attorney General, December 30, 1959, 19 Pike & Fischer Radio Reg. 1901, 1905. See also, for the Commission's view prior to 1960, Hearings before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce on S. 1333, 80th Cong., 1st Sess. 14, 51.

[3] H. R. Rep. No. 1800, 86th Cong., 2d Sess. 17; see also S. Rep. No. 1857, 86th Cong., 2d Sess. 4, 8–10. In addition to the three sanctions provided by the Communications Act amendments of 1960, the House bill had also originally provided for a Commission power to suspend licenses for minor violations, for periods not to exceed 10 days. The Senate Committee, however, recommended against the provision for suspension, and it was dropped from the final bill. See generally, concerning the scope and provisions of the 1960 amendments, Enforcement Provisions of the Communications Act, 18 Fed. Communications B. J. 45 (1963).

short-term licenses.[4] Forfeitures have been imposed for "violations that do not warrant revocation proceedings"; [5] and cease-and-desist orders have been issued for the first time in broadcast cases.[6] Thus infractions which would heretofore have gone formally unregulated are apparently now being dealt with because the Commission may impose sanctions more commensurate with the gravity of the offense.

This is not to say that before the 1960 amendments the Commission never found the cancellation power useful in curbing some abuses now policed under the less drastic sanctions. Indeed, the Commission's informal policing of minor complaints had some success precisely because the "death sentence" could be imposed. "The licensing power of the FCC," one commentator has said, "hangs like a constant Damocles' sword over broadcasting." [7] The Commission regularly reported to Congress that a great number of complaints about programming or

---

[4] See 28 F. C. C. Ann. Rep. 47–48 (1962); New York Times, July 14, 1961, p. 37, col. 2. Although under the Communications Act of 1934 the Commission presumably possessed the power to issue licenses for terms shorter than the statutory maximum, a formal rule provided that maximum-period licenses would be regularly granted. The purpose of the amendment was, therefore, simply to reaffirm the existence of the power to issue licenses for less than the statutory three-year maximum. See H. R. Rep. No. 1800, 86th Cong., 2d Sess. 8–9.

[5] See 28 F. C. C. Ann. Rep. 46–47 (1962). At least one of the forfeiture proceedings reported by the Commission in its most recent report concerned the advertising practices of a licensee, who paid a forfeiture of $5,000. See id., at 54.

[6] See 27 F. C. C. Ann. Rep. 37, 40 (1961). Although provision was made for cease-and-desist orders in 1952, see 66 Stat. 717, until the 1960 amendment this sanction was invoked only in cases involving technical violations.

[7] Schwartz, Antitrust and the FCC: The Problem of Network Dominance, 107 U. of Pa. L. Rev. 753, 769 (1959).

advertising were readily resolved by "informal adjust-
ment," without need for recourse to formal hearings,
much less to revocation proceedings.[8]  The Commission,
it appears, though sparingly invoking the cancellation
power, had "powerful informal sanctions working in its
favor, for the constant theoretical threat of license revo-
cation at renewal time is always present . . . . [I]f a
complaint arises in the programming field that accuses a
station of violating FCC standards the mere notification
of the respondent of the fact of the complaint would
result in immediate settlement in many cases." [9]

It seems to me, then, that a conclusion of nondisplace-
ment of the state statute at bar by the Federal Communi-
cations Act can rest neither upon the practical inability
of the FCC to police those practices which the State has
forbidden, nor upon any want of authority in the Com-
mission to regulate the subject matter of the New Mexico
statute.  Actually, the Commission has concerned itself
with the content of radio advertising almost from the time
that federal regulation of commercial broadcasting began.
Advertising abuses in the early days of radio were a
constant source of embarrassment and concern to the
Commission and its predecessor, the Federal Radio Com-

---

[8] See 2 F. C. C. Ann. Rep. 19 (1936); 4 F. C. C. Ann. Rep. 69
(1938); 7 F. C. C. Ann. Rep. 27 (1941); Smead, Freedom of Speech
by Radio and Television (1959), 30 and n. 63; Note, The Regulation
of Advertising, 56 Col. L. Rev. 1018, 1048 (1956).  One author has
suggested that "[t]he net result has been regulation of programming
by raised eyebrow."  Note, Broadcast Licensee's Past Conduct as a
Determinant of the Public Interest, 23 U. of Pitt. L. Rev. 157, 170
(1961).  It has also been noted that speeches and informal statements
by individual Commissioners have often had significant impact upon
programming and other activities of licensees.  Note, Television Pro-
gramming, Communication Research, and the FCC, 23 U. of Pitt. L.
Rev. 993, 996 (1962).

[9] Woll, Administrative Law: The Informal Process (1963), 139.

mission.[10] One of the principal abuses complained of was the very aspect of commercial sponsorship with which the New Mexico statute is concerned—"direct" or price advertising. The First Annual Radio Conference, meeting in 1922 at the invitation of Secretary Hoover, strongly recommended "that direct advertising in radio broadcasting service be absolutely prohibited . . . ."[11] · At least one station lost its license during the '20's because, among other abuses, it had indulged excessively in "direct advertising, including the quoting of prices."[12] And until the passage of the Communications Act in 1934, members of the Commission and of Congress continued to hope that broadcasting free of all commercials—or at least devoid of direct advertising, one form of sponsorship particularly objected to—might become a commercial reality.[13] Even

---

[10] See Emery, Broadcasting and Government: Responsibilities and Regulations (1961), 11–13; Moser and Lavine, Radio and the Law (1947), §§ 42, 43; Perry, Weak Spots in the American System of Broadcasting, 177 Annals Am. Acad. Pol. & Soc. Sci. 22, 24–25 (1935).

[11] Quoted in Federal Communications Commission, Public Service Responsibility of Broadcast Licensees (1946), 41.

[12] *Ibid.* The Commission explained its refusal to prohibit all direct advertising as follows: "The Commission is not fully convinced that it has heard both sides of the matter, but is willing to concede that in some localities the quoting of direct merchandise prices may serve as a sort of local market, and in that community a service may thus be rendered. That such is not the case generally, however, the commission knows from thousands and thousands of letters which it has had from all over the country complaining of such practices." 2 F. R. C. Ann. Rep. 168–169 (1928).

[13] See, *e. g.*, Hearings before Senate Committee on Interstate Commerce on S. 6, 71st Cong., 1st Sess., pt. 5, p. 192; *id.*, pt. 6, p. 230. One may only speculate what might have been the course of American broadcasting had such a prohibition been imposed. For recent difficulties which Sweden has experienced under a general ban on radio advertising, see New York Times, April 2, 1961, p. 1, col. 3; *id.*, April 3, 1961, p. 8, col. 4.

representatives of the industry shared this hope for a time.[14]

The advent of the 1930's apparently foreclosed the possibility of radio without commercials, and the Commission shifted its attention to a more discriminating appraisal of the content of advertising over the air. As early as 1928, for example, the General Counsel of the Radio Commission held that abuses in network cigarette advertising—while not a sufficient basis for revocation proceedings against an individual licensee—might on renewal militate against the requisite finding of broadcasting in "the public interest." [15] During the mid-1930's, moreover, the Commission repeatedly warned that advertising excesses and the use of commercial material offensive to the listening public might constitute grounds for

[14] Hearings before Senate Committee on Interstate Commerce on S. 6, 71st Cong., 2d Sess., pt. 13, pp. 1705–1706. Compare Durstine, The Future of Radio Advertising in the United States, 177 Annals Am. Acad. Pol. & Soc. Sci. 147, 149 (1935).

[15] Opinion No. 32, 1928–1929 Opinions of the General Counsel, Federal Radio Commission, 77, 81–82. The General Counsel also rejected the contention that such consideration of a licensee's past advertising practices might amount to censorship, partly on the ground of a "necessary distinction between restrictions placed upon the transmission of intelligence for which there is a general public demand and need and limitations imposed upon broadcasting propaganda, intended to obtain commercial success, for which there is no such demand or need." Id., at 81.

Shortly after the issuance of the General Counsel's opinion, the Chairman of the Federal Radio Commission was asked by Senator Dill during his appearance before the Senate Commerce Committee whether he thought the Commission had sufficient power "through its power of regulation and its determination of public interest to handle objectionable advertising." The Chairman replied, "I think so, Senator Dill, because we have had little trouble about it, even without direct power. We have been able to improve some programs." Hearings before Senate Committee on Interstate Commerce on S. 6, 71st Cong., 1st Sess., pt. 6, p. 230.

the cancellation of a license.[16]  However, no license appears to have been withdrawn solely for that reason. Rather, the possibility of cancellation seems to have been employed as a threat, and an effective one, for the Commission continued to report its satisfaction that many complaints of this nature were settled through the use of warnings and other informal sanctions outside the formal administrative machinery. Recourse to these informal solutions seems to have been extensive at least until 1940.

Since World War II, however, the Commission has apparently followed a policy which puts less emphasis upon regulation of the content and quality of commercials. In its 1946 "Blue Book," the Commission, although cataloguing various advertising abuses, including several which directly involved content, expressly disavowed any intention to regulate directly "advertising excesses other than an excessive ratio of advertising time to program time . . . ."[17]  The "Blue Book" stated, regarding the other forms of abuse: "The Commission has no desire to concern itself with the particular length, content, or irritating qualities of particular commercial plugs."[18]  There

---

[16] See, e. g., Knickerbocker Broadcasting Co., 2 F. C. C. 76; WSBC, Inc., 2 F. C. C. 293; Hammond-Calumet Broadcasting Corp., 2 F. C. C. 321; Oak Leaves Broadcasting Station, Inc., 2 F. C. C. 298; Farmers & Bankers Life Ins. Co., 2 F. C. C. 455.  In Ben S. McGlashan, 2 F. C. C. 145, 152, the Commission dismissed as "manifestly contrary to the law" the suggestion that "licensees should not have the duty of examining into the propriety of advertising to be broadcast . . . ."  Cf. KFKB Broadcasting Assn., Inc., v. Federal Radio Comm'n, 60 App. D. C. 79, 47 F. 2d 670.  See generally Moser and Lavine, Radio and the Law (1947), § 43; Note, Governmental Regulation of the Program Content of Television Broadcasting, 19 Geo. Wash. L. Rev. 312, 317 (1951).

[17] Federal Communications Commission, Public Service Responsibility of Broadcast Licensees (1946), 47.

[18] Id., at 56.

are more recent signs of renewed attention to the subject of advertising content, but nothing appears to approach the pervasive superintendence of the 1930's.[19] In any event the FCC has seemed content to leave to the Federal Trade Commission the regulation of much of the field, particularly the policing of false, misleading or deceptive advertising designed for radio and television broadcast. While the FCC has consistently warned its licensees that the continued broadcasting of material found by the FTC to be deceptive or misleading "would raise serious questions as to whether such stations are operating in the public interest," its policy seems to have been to leave the matter of direct and immediate sanctions largely to the Trade Commission.[20]

---

[19] See, e. g., WREC Broadcasting Service, 10 Pike & Fischer Radio Reg. 1323, 1350–1351, 1358–1359; Liberty Television, Inc., 30 F. C. C. 411, 414; 28 F. C. C. Ann. Rep. 54–55 (1962). Cf. Public Notice, "Double Billing" Practices, March 7, 1962, 23 Pike & Fischer Radio Reg. 175; Sam Morris, 11 F. C. C. 197; Hale and Hale, Competition or Control II: Radio and Television Broadcasting, 107 U. of Pa. L. Rev. 585, 603–607 (1959).

[20] Liaison Between FCC and FTC Relating to False and Misleading Radio and TV Advertising, Feb. 21, 1957, 14 Pike & Fischer Radio Reg. 1262.

The Trade Commission first assumed responsibility for radio advertising in 1934, see 2 Socolow, The Law of Radio Broadcasting (1939), §§ 540–542; Davis, Regulation of Radio Advertising, 177 Annals Am. Acad. Pol. & Soc. Sci. 154, 156–157 (1935). The FCC also instituted during the 1930's a policy of referring misleading and deceptive advertising complaints to the Trade Commission. See 6 F. C. C. Ann. Rep. 55 (1940); 7 F. C. C. Ann. Rep. 27 (1941). Since 1957 there has been a particularly close liaison between the two agencies with respect to advertising matters, see Deceptive Practices in the Broadcasting Media, 19 Pike & Fischer Radio Reg. 1901, 1923; 27 F. C. C. Ann. Rep. 40 (1961). The FCC has also announced a policy of keeping its licensees informed of applicable rulings of the Trade Commission, 28 F. C. C. Ann. Rep. 44 (1962). For surveys of the Trade Commission's present regulation of radio and television advertising, see generally Emery,

442

## II.

It is against this pattern of federal regulation that we must apply in this case the settled tests by which we determine whether federal legislation has displaced state regulation of a given subject matter. Under the first test the subject matter, here radio and television broadcasting, is clearly not one "by its very nature admitting only of national supervision . . . ." *Florida Lime & Avocado Growers, Inc.*, v. *Paul*, 373 U. S. 132, 143. Nothing in our decisions which have required particular state regulations to yield to the Communications Act suggests such

---

Broadcasting and Government: Responsibilities and Regulations (1961), 58–65; Smead, Freedom of Speech by Radio and Television (1959), 31–33; 37 Notre Dame Law. 524 (1962); 36 St. John's L. Rev. 274 (1962); 10 U. C. L. A. L. Rev. 417 (1963).

In view of the activity of the Federal Trade Commission in matters of radio and television advertising, it might be argued that the Supremacy Clause question should be judged by the powers and sanctions of that agency instead of by those of the FCC. Several answers may be made to that suggestion. First, the remedial powers of the Trade Commission are only very rarely accorded preemptive effect, *e. g., Bedno* v. *Fast*, 6 Wis. 2d 471, 95 N. W. 2d 396. Second, broadcasters and publishers are expressly exempted from the criminal penalties against false and deceptive advertising, 15 U. S. C. § 54 (b). Thus, FTC regulation of advertising over the air tends to be indirect, the sanctions being imposed upon the sponsor, and, occasionally, upon the advertising agency. See, *e. g., Colgate-Palmolive Co.* v. *Federal Trade Comm'n*, 310 F. 2d 89. Third, it appears that the FTC is neither equipped for nor desirous of assuming exclusive responsibility for essentially local advertising abuses, particularly where the state regulation complements the federal prohibitions. See Comment, State Control of Bait Advertising, 69 Yale L. J. 830, 845–846 (1960). Finally, federal preemption would threaten to disrupt unduly the existing schemes of state and local regulation of advertising in an area in which no overriding need for federal uniformity appears, Note, The Regulation of Advertising, 56 Col. L. Rev. 1018, 1076 (1956), and in which there may even be some doubt as to the FTC's jurisdiction, see 29 Geo. Wash. L. Rev. 808, 811–813 (1961).

a view of the regulatory field. Cf. *Farmers Educational & Cooperative Union* v. *WDAY, Inc., supra.* Although in *Radio Station WOW, Inc.,* v. *Johnson, supra,* at 131–132, we decreed the displacement of state law in some respects, we recognized that state regulation in other respects might be constitutional.

The second test, whether there is evidence of congressional intent exclusively to occupy the field, is apposite but the requisite evidence is lacking. We have said, to be sure, that "[n]o state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of radio facilities." *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co.,* 289 U. S. 266, 279. But that language should not be read as construing the Communications Act to mandate the ouster of all local regulation the application of which might in any way prevent perfect national uniformity.[21] Indeed, even the Solicitor General, in his brief as *amicus curiae,* concedes as much by his recognition that Congress intended the survival of certain "traditional" state powers and remedies—particularly common-law tort and traditional criminal sanctions.

Rather than mandate ouster of state regulations, several provisions of the Communications Act suggest a congressional design to leave standing various forms of state regulation, including the form embodied in the New Mexico statute. First, the Act contains a "saving clause," 47 U. S. C. § 414, providing that "Nothing in this chapter

---

[21] Compare, *e. g., Kroeger* v. *Stahl,* 248 F. 2d 121, with, *e. g., Western Union Telegraph Co.* v. *State,* 207 Ga. 675, 63 S. E. 2d 878; *National Broadcasting Co.* v. *Board of Public Utility Comm'rs,* 25 F. Supp. 761; *RCA Communications, Inc.,* v. *Patchogue Broadcasting Co., Inc.,* 19 Pike & Fischer Radio Reg. 2071. See generally Emery, Broadcasting and Government: Responsibilities and Regulations (1961), 72–73; Note, State Regulation of Radio Lotteries, 1952 Wis. L. Rev. 177, 180–181.

contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." Of course such a general provision does not resolve specific problems, *Arrow Transportation Co. v. Southern R. Co.*, 372 U. S. 658, 671, n. 22, but its inclusion in the statute plainly is inconsistent with congressional displacement of the state statute unless a finding of that meaning is unavoidable.[22] Second, the statutory regulation of radio and television broadcasting is far less comprehensive than the regulation in the very same title of telephone and telegraph facilities, *Federal Communications Comm'n v. Sanders Bros. Radio Station,* 309 U. S. 470, 474—yet even as to those means of communications some subjects and remedies are saved to state regulation. Finally, Congress has enacted detailed regulations of some broadcasting practices (not including that regulated by the New Mexico statute)—*e. g.*, the manner in which sponsorship must be identified and announced, 47 U. S. C. § 317; the uttering of any "obscene, indecent, or profane language" over the air, 18 U. S. C. § 1464; and the transmission of communications known to contain fraudulent matter, 18 U. S. C. § 1343; cf. 47 U. S. C. § 509. While the failure expressly to regulate *nondeceptive* advertising surely does not deprive the FCC of all such jurisdiction, that failure argues against a congressional design that state regulation was to be ousted. Cf. *Federal Communications Comm'n v. American Broadcasting Co.,* 347 U. S. 284.

This brings me to the third test—whether as a practical matter "both regulations can be enforced without impairing the federal superintendence of the field . . . ." *Flor-*

---

[22] See Note, State Regulation of Radio and Television, 73 Harv. L. Rev. 386, 387–388 (1959); Note, Governmental Regulation of the Program Content of Television Broadcasting, 19 Geo. Wash. L. Rev. 312, 322–323 (1951).

*ida Lime & Avocado Growers, Inc.,* v. *Paul, supra,* at 142.
It is the application of this criterion which reveals the
basic difference between this case and *WDAY.* We held
there that the strong federal interest represented by the
"equal time" obligation which § 315 imposes upon broad-
casters with respect to political candidates would be frus-
trated if not altogether defeated by the survival of state
remedies against the broadcaster for allegedly defamatory
political broadcasts. Thus the conflict in operation be-
tween the federal and state laws which converged in that
case made it inevitable that the state law should yield in
the interests of a particular federal regulatory scheme.

The instant case, by contrast, presents no such conflict
or dissonance. The New Mexico law is one designed prin-
cipally to protect the State's consumers against a local
evil by local application to forbid certain forms of adver-
tising in all mass media. Such legislation, whether con-
cerned with the health and safety of consumers, or with
their protection against fraud and deception, embodies a
traditional state interest of the sort which our decisions
have consistently respected. *Rice* v. *Santa Fe Elevator
Corp.,* 331 U. S. 218, 230. Nor is such legislation required
to yield simply because it may in some degree restrict the
activities of one who holds a federal license. Cf. *Huron
Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 447–448.

A conclusion that the state regulation is ousted by the
federal requires, under this third test, a showing of con-
flict either in purpose or in operation between the state
and federal regulations involved. The contrary of such
a showing is made here, for the FCC, in determining
whether a licensee's operation has served the public
interest, considers whether he has complied with state and
local regulations governing advertising [23]—in other words,

---

[23] See Letter of Acting Chairman Paul A. Walker to Senator Ed-
win C. Johnson, August 11, 1949, 5 Pike & Fischer Radio Reg. 593,
594.

the Commission accords important deference to the continued operation of state law in this field. Moreover, the National Association of Broadcasters has also consistently counseled obedience to state law on such matters. The Association, in its extensive Codes of Good Practices for both radio and television, unmistakably enjoins each member to "refuse the facilities of his station to an advertiser where he has good reason to doubt the integrity of the advertiser, the truth of the advertising representations, or the compliance of the advertiser with the spirit and purpose of all applicable legal requirements"; [24] the Television Code, moreover, expressly enjoins: "Diligence should be exercised to the end that advertising copy accepted . . . complies with pertinent Federal, state and local laws." [25]

Finally, a practical consideration militates strongly against giving the federal statute preemptive effect in the absence of a clear congressional mandate. Even if the FCC is generally able and willing to regulate advertising abuses, the agency would understandably desire to share with state agencies the responsibility for policing the myriad local and occasional violations of the canons of advertising. Otherwise the burden might well become so heavy as to produce a "no-man's land," cf. *Guss* v. *Utah Labor Board,* 353 U. S. 1, in which there would be at best selective policing of the various advertising abuses and excesses which are now very extensively regulated by state law.[26] That could only mean a partial exemption

---

[24] Quoted in Emery, Broadcasting and Government: Responsibilities and Regulations (1961), 430, 445.

[25] *Id.,* at 445.

[26] See generally Moser and Lavine, Radio and the Law (1947), c. V; Note, State Regulation of Radio Lotteries, 1952 Wis. L. Rev. 177; State Legislation Affecting Radio and Television, 1951–1952, 12 Fed. Communications B. J. 261 (1952); Note, State Control of Bait Advertising, 69 Yale L. J. 830 (1960).

of radio and television, alone among the media, from local regulations and a denial of the protection which consumers rightly expect from government.[27]

## III.

Our holding today intimates no view of the constitutionality of several other superficially similar forms of state regulation of broadcasting. First, nothing here said suggests that a system of state regulation, although not in direct conflict with federal law, would pass muster if it were so pervasive and so burdensome upon broadcasters as to interfere substantially with the overall purposes of federal regulation. Cf. *Allen B. Dumont Labs.* v. *Carroll, supra.* Second, nothing said answers the problem of the situation, factually closer to that at bar but legally quite distinct, which would be presented if a State in which nationwide network material originates sought to restrict network advertising under a statute enacted for the protection only of that State's consumers. Such regulation might well exceed the scope of the State's legitimate interests and involve a constitutionally illegitimate attempt to control communications beyond its borders. Cf. *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520; *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 775. Third, nothing said here may be read to sustain the constitutionality of applications of local advertising regulations which threaten to make it impossible for a local

---

[27] This is not to suggest that a statute which formally exempted certain media from penalties upon certain types of advertising would necessarily represent any violation of the Equal Protection Clause. See *Packer Corp.* v. *Utah*, 285 U. S. 105, 108–110. Cf. Calif. Bus. & Prof. Code § 17502, which was amended in 1951 to exempt from the prohibitions against false and deceptive advertising a newspaper or radio station which "broadcasts or publishes an advertisement in good faith, without knowledge of its false, deceptive, or misleading character."

station to transmit network broadcasts because of their sponsorship.[28] While the State's interest might be no different from that protected by this New Mexico statute, the more drastic effect of the regulation upon the exercise of the broadcaster's federal license and his access to network material might well require a different result. All that the Court decides today is that this New Mexico statute may constitutionally be enforced against radio broadcasters equally with other news media doing business in New Mexico.

---

[28] See Note, State Regulation of Radio and Television, 73 Harv. L. Rev. 386, 393–395 (1959).